UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. André M. Espinosa |
| | : | |
| v. | : | |
| | : | Mag. No. 24-11000 |
| MONISHKUMAR KIRANKUMAR DOSHI SHAH, | : | |
| a/k/a "Monish Doshi Shah" | : | **CRIMINAL COMPLAINT** |

I, Special Agent Kenneth Nichols, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

Continued on the attached page and made a part hereof:

_____
Kenneth Nichols
Special Agent
Homeland Security Investigations
Department of Homeland Security

Special Agent Kenneth Nichols attested to this Complaint by telephone pursuant to Fed. R. Crim. P. 4.1(b)(2)(A), on February 26, 2024.

HONORABLE ANDRÉ M. ESPINOSA          _____
UNITED STATES MAGISTRATE JUDGE       Signature of Judicial Officer

1

## ATTACHMENT A

### COUNT ONE
**(Conspiracy to Commit Wire Fraud)**

From in or around January 2015, through in or around September 2023, in the District of New Jersey, and elsewhere, the defendant,

**MONISHKUMAR KIRANKUMAR DOSHI SHAH,**
a/k/a "Monish Doshi Shah,"

knowingly and intentionally conspired and agreed with others to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (Operating and Aiding and Abetting the Operation of an Unlicensed Money Transmitting Business)

From in or around July 2020, through in or around November 2021, in the District of New Jersey, and elsewhere, the defendant,

MONISHKUMAR KIRANKUMAR DOSHI SHAH,
a/k/a "Monish Doshi Shah,"

knowingly conducted, controlled, managed, supervised, and directed an unlicensed money transmitting business, and aided and abetted the conduct, control, management, supervision, and direction of such a money transmitting business, which business affected interstate and foreign commerce, and: (a) was a business operated without an appropriate money transmitting license in a state where such operation is punishable as a misdemeanor or a felony under state law, that is, the State of New York and State of New Jersey; and (b) was a business required to register with the Financial Crimes Enforcement Network ("FinCEN"), an agency of the United States government, pursuant to Section 5330 of Title 31, United States Code.

In violation of Title 18, United State Code, Sections 1960(a), (b)(1)(A) and (b)(1)(B), and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Kenneth Nichols, am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other items of evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Introduction

1. HSI, Internal Revenue Service–Criminal Investigation ("IRS-CI"), and the Federal Deposit Insurance Corporation–Office of Inspector General ("FDIC-OIG") have been investigating Monishkumar Kirankumar Doshi Shah, a/k/a "Monish Doshi Shah" ("Shah"), who owns and/or controls multiple alleged jewelry companies. During the investigation, law enforcement determined that Shah engaged in a conspiracy to evade lawful duties for shipments of jewelry to the United States. Specifically, and as explained further below, the United States charges a duty for jewelry imported from Turkey and India to the United States. To evade that duty, Shah created companies in South Korea, from which shipments are not charged a duty by the United States. Shah then had jewelry manufacturers in Turkey and India ship jewelry to his South Korean companies, which he then immediately turned around and shipped to the United States, thereby evading the duty.

2. In addition, law enforcement learned that Shah used his companies to conduct, control, manage, supervise, and direct a large-scale, unlicensed money transmitting business operating in New Jersey, New York, and elsewhere. Specifically, and as explained further below, Shah illegally charged a fee from customers to convert millions of dollars of cash into checks or wire transfers.

### Background

3. At all times relevant to this Complaint, unless otherwise indicated:

   a. Shah lived in Jersey City, New Jersey and/or Mumbai, India.

   b. Shah owned and/or operated entities allegedly engaged in the jewelry and precious metals industry, including MKore LLC ("MKore"), MKore USA Inc ("MKore USA"), Vruman Corp ("Vruman"), Pani Trading Co. ltd, a/k/a "Pani Trading Company" ("Pani Trading"), and KT International Co. Ltd. ("KT International") (collectively, the "Shah Entities").

      i. MKore was incorporated in New Jersey and had a principal place of business in New York.

      ii. MKore USA was incorporated in New York and had a principal place of business in New York.

      iii. Vruman was incorporated in New York and had a principal place of business in New York.

      iv. Pani Trading had a principal place of business in South Korea.

      v. KT International had a principal place of business in South Korea.

c. As explained below, Individual-1, Individual-2, and Individual-3 were some of Shah's co-conspirators for the wire fraud and unlicensed money transmitting schemes. Individual-1, Individual-2, and Individual-3 lived in Edison, New Jersey.

      i. Individual-1, Individual-2, and Individual-3 controlled numerous alleged jewelry, diamond, and precious metals businesses registered and operating in New York and/or New Jersey.

d. As explained below, Individual-4 was one of Shah's co-conspirators for the wire fraud and unlicensed money transmitting schemes. Individual-4 lived in Great Neck, New York.

      i. Individual-4 operated a purported jewelry company registered and operating in New York.

### The Duty Evasion Scheme

4. During the investigation, law enforcement determined that Shah engaged in a scheme to evade duties for shipments of jewelry from Turkey and India to the United States. To do this, Shah would ship or instruct his co-conspirators to ship goods from Turkey or India—which would have been subject to an approximately 5.5% duty if shipped directly to the United States—to one of Shah's companies in South Korea. Shah's co-conspirators in South Korea would change the labels on the jewelry to state that they were from South Korea instead of Turkey or India, and then ship them to Shah or his customers in the United States, thereby unlawfully evading the duty. Shah would also make and instruct his customers to make fake invoices and packing lists to make it look like Shah's South Korean companies were actually ordering jewelry from Turkey or India. During the scheme, Shah shipped millions of dollars of jewelry from South Korea to the United States.

5. Law enforcement lawfully obtained numerous communications indicating that Shah conspired to commit wire fraud in an effort to evade customs duties, including the following representative interstate and foreign WhatsApp communications:

| Approximate Date | Summary of Communications |
| --- | --- |
| December 11, 2020 | Shah recruited a South Korean national to participate in the scheme, which Shah said was "[t]o avoid duty." |
| February 25, 2021 | Shah provided Individual-4 with information to ship goods to Shah's company Pani Trading in South Korea, create fake invoices and packing lists, and send a wire to Pani Trading. Individual-4 then provided the information to one of his/her suppliers in Turkey, who arranged to send jewelry first to Pani Trading in South Korea, which would then ship the jewelry to Individual-4 in the United States. |
| March 24, 2021 | Shah asked Individual-4 for additional information so he could make a slightly different looking packing list for the shipments from South Korea to the United States. Shah also told Individual-4 to have an employee make a fake order concerning shipments from Individual-4's Turkish suppliers. |
| May 18, 2021 | Shah told Individual-4 that he conducts the same scheme for one of his customers from India as he does for Individual-4 from Turkey. |
| July 30, 2021 | Shah caused a third-party shipping company to falsely respond to an inquiry from U.S. Customs and Border Protection concerning a shipment from Pani Trading to MKore. In the response, the shipping company falsely stated that goods shipped to the United States had originated in South Korea and attached a letter from Pani Trading claiming the same. |
| September 24, 2021 | Shah asked Individual-1 for "wires to my Korean company," and then indicated that he would import jewelry "duty free" to four of Individual-1's companies. Shah then sent wire instructions for KT International and Pani Trading in South Korea. On the same day, two |

| | |
|---|---|
| | of Individual-1's companies wired approximately $50,000 each to Pani Trading. |
| April 7, 2022 through April 9, 2022 | Shah talked with Individual-1 about the scheme involving India, Korea, and the United States. Shah said Individual-1 could send lab grown diamonds to India to get them finished with a setting, and then import them back "without [d]uty." Shah and Individual-1 then arranged to meet in person to discuss in New Jersey. |

### The Unlicensed Money Transmitting Scheme

6. During the investigation, law enforcement also learned that Shah accepted large quantities of cash from customers, deposited the cash into accounts associated with some of the Shah Entities, and then issued checks or wire transfers to the customers or their preferred recipients. On other occasions, Shah accepted large quantities of cash from customers, provided the cash to other co-conspirators—including Individual-1, Individual-2, and Individual-3—who then deposited the cash into accounts in the names of their companies, and then Shah's co-conspirators issued checks or wire transfers in the names of Shah's customers or their preferred recipients. For their services, Shah and his co-conspirators charged a fee.

7. Based on a review of bank records, law enforcement learned that Shah sent more than $11 million from the Shah Entities to Individual-4's company; companies controlled by Individual-1, Individual-2, and Individual-3 sent more than $8 million to the Shah Entities; and companies controlled by Individual-1, Individual-2, and Individual-3 sent more than $26 million to Individual-4's company. Based on the investigation to date, many of these transactions were in furtherance of unlicensed money transmitting activities. During the course of the scheme, Shah and his co-conspirators made cash deposits and conducted other relevant transactions in New York, New Jersey, and elsewhere.

8. Law enforcement lawfully obtained numerous communications indicating that Shah operated an unlicensed money transmitting business, including the following representative WhatsApp communications:

| Approximate Date | Summary of Communications |
|---|---|
| December 7, 2020 | Shah asked in coded language whether Individual-1 could take $300,000 in $20 bills from a customer. Individual-1 said that he would take the cash and send payment the following week for a 2% fee. |
| January 13, 2021 | Shah asked Individual-1 and Individual-2 how much they would charge to convert $500,000 in |

7

|  | cash into checks, to which Individual-1 responded they would charge 2%. Individual-2 indicated that Individual-3 would pick up the cash. Individual-1 asked that the checks be made out to Individual-4's company. Individual-2 then asked for Shah to give him/her a day to make the check. |
|---|---|
| January 28, 2021 | Shah told Individual-1 to have someone pick up $700,000 in cash and then remit checks to Individual-4 and MKore. |
| April 6, 2021 and April 7, 2021 | Shah told Individual-4 that someone had offered to pick up $1 million and provide checks the following week. Individual-4 indicated he was interested, so Shah confirmed. The following day, Individual-4 sent Shah fictitious invoices from his company to companies operated by Individual-1, Individual-2, and Individual-3 falsely indicating that legitimate gold transactions had occurred between them. |
| May 13, 2021 | Individual-4 complained that Shah does a worse job than Individual-1 of spreading out the checks when he converts cash, so Individual-1 was a better option. Shah responded that he could similarly spread out the checks. |

9. At all times relevant to this Complaint, neither Shah nor any of the Shah Entities, or the entities controlled by Individual-1, Individual-2, or Individual-3, were registered as a money service business in New York, New Jersey, or with FinCEN.

8